**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **E.O.H.C., on his own behalf, and on behalf of M.S.H.S., his minor daughter, as her next friend,** | **Case No. 5:19-cv-06144-JDW** |
| *Petitioners*, | |
| v. | |
| **WILLIAM BARR, in his official capacity as the Attorney General of the United States, et al.,** | |
| *Respondents*. | |

## <u>MEMORANDUM</u>

Mr. H and his daughter Mia ("Petitioners") came to this country illegally from Guatemala. They want to join their wife and mother, who is living in New Jersey with her newborn son. Their goals are understandable. They want to stay together after all they have been through together, and they want their family to be together, at least while they await word from the Department of Homeland Security ("DHS")[1] as to whether they will be allowed to stay in this Country. They ask this Court to issue a preliminary injunction releasing both of them immediately pending the outcome of their removal proceedings, or at least to order DHS to conduct a hearing to determine whether they should be released.

Petitioners, however, must show more than noble goals and an empathetic case to obtain the relief that they seek from this Court. They must show, among other things, a substantial likelihood of success on the merits of their legal claims. They have not made such a showing.

---

[1] The Court uses the term "DHS" to refer to all respondents here.

Instead, they have asked the Court to wade into uncharted territory and to declare for them Constitutional rights that no other Court has recognized.  The Court declines to do so.  It therefore must deny the Motion.

## I.   FACTUAL FINDINGS

### A.   Petitioners' Entry Into The United States Without Inspection

Mr. H and his seven-year-old daughter Mia are currently detained at the Berks Family Residential Center ("BFRC").  Mr. H is married to Mia's mother ("Mrs. H").  Mrs. H currently resides in New Jersey with an infant son who was born in the United States in November 2019.

In 2014, Mr. H entered the United States without inspection and was removed back to Guatemala.  (Tr. 1/6/2020 at 125:2–125:17.)  In 2018, Mrs. H applied for non-immigrant tourist visas for herself and Mia to travel to the United States to visit friends.  (ECF Nos. 27, 27-1.)  DHS approved Mrs. H's visa, but not Mia's visa.  (ECF Nos. 1 at ¶ 56; ECF Nos. 27-1, 27-2, 27-3 at ¶ 8.)  Mrs. H arrived in the United States pursuant to that visa on April 18, 2019.  She was pregnant at the time.

Unable to obtain visas, Mr. H and Mia traveled over land through Mexico to the United States.  On April 23, 2019, Mr. H and Mia entered the United States without inspection.  They encountered a Border Patrol Agent, who took them into custody.  (ECF No. 1 at ¶ 57; ECF No. 27-4.)

DHS issued Mr. H and Mia Notices To Appear, requiring them to appear in San Diego before an Immigration Judge on June 25, 2019, for "standard removal proceedings" under Section 240 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229.  (ECF No. 1 at ¶ 61.)  DHS deemed Petitioners subject to the Migrant Protection Protocols ("MPP") and returned them to

Mexico on April 29, 2019, pending the resolution of their immigration case. (ECF Nos. 27-24, 27-25.) In their Petition, Petitioners describe deplorable conditions in which they lived in Mexico.

Petitioners arrived at the border for their scheduled hearing on June 25, 2019, and were transported to a hearing before an Immigration Judge. (ECF No. 1 at ¶ 69.) Mr. H participated in that hearing *pro se* and waived an appeal. (ECF No. 27-12.) He did not express a fear of returning to Guatemala. (*Id.*) However, Mr. H expressed that he did not want to return with Mia to Mexico. (*Id.* at 12:18–12:19.) The Immigration Judge ordered Petitioners removed to Guatemala. (*Id.* at 11:15–11:16.) On June 27, 2019, Petitioners were transported to BFRC for processing for removal. (ECF No. 1 ¶ 71.)

## B.    Mr. H's And Mia's Detention At BFRC

Once at BFRC, Petitioners retained counsel. On July 12, 2019, Petitioners filed a direct appeal with the Board of Immigration Appeals ("BIA"), challenging whether their waiver of an appeal at their immigration hearing was voluntary, knowing, and intelligent. (ECF Nos. 27-21; 27-30 at Ex. E.) That appeal triggered an automatic stay of Petitioners' removal pursuant to 8 C.F.R. § 1003.6(a). The BIA also granted a stay on July 23, 2019, pending the outcome of Petitioners' appeal. (ECF No. 27-22; 27-30 at Ex. G.) On December 4, 2019, the BIA sustained the appeal and determined that Mr. H's and Mia's waiver of rights was not knowing or intelligent. (ECF No. 1 at ¶ 93.)

On August 5, 2019, while the BIA appeal was pending, Petitioners filed their first action in this Court and sought a temporary restraining order ("TRO") and preliminary injunction to prevent DHS from transferring them to Mexico pending resolution of their removal proceedings. The Court held that it had no jurisdiction to hear those claims. *See Hernandez Culajay v. McAleenan*, 396 F. Supp.3d 477 (E.D. Pa. 2019). That case is currently on appeal. During the

pendency of the appeal, the Parties reached an agreement that DHS would keep Petitioners at BFRC, rather than return them to Mexico, and in exchange, Petitioners would not seek a stay and would support expedited briefing in the Court of Appeals. (ECF No. 27-23.)

On August 9, 2019, a DHS asylum officer conducted an assessment of Petitioners' claims regarding their fear of return to Mexico as part of MPP. The asylum officer concluded that Petitioners did not establish a clear probability of torture or persecution on account of a protected ground or of torture in Mexico. On or about August 29, 2019, counsel for Petitioners filed an asylum application for the family, including Mrs. H as a derivative applicant. (Tr. 1/6/2020 at 154:20–154:22.) To the Court's knowledge, Petitioners' asylum application remains pending.

In August 2019, Petitioners' counsel enlisted an expert to evaluate Mia's mental health. On August 26, 2019, Dr. Sarah Berthold, who holds a PhD in social work, evaluated Mia's mental condition. (ECF No. 26-1; Tr. 1/6/2020 at 184:17–187:8; 194:8–194:9.) Dr. Berthold was not admitted to BFRC. Therefore, she interviewed Mia and Mr. H via Skype. She spoke to each of them for about forty-five minutes, and then she spoke with them together for another ten minutes. (Tr. 1/6/2020 at 201:24–202:4, 203:4-203:10.) Dr. Berthold spoke with Mr. H to obtain his consent to evaluate Mia and to gather collateral information about her. (Tr. 1/6/2020 at 201:19–201:23.) Dr. Berthold did not evaluate or assess Mr. H's mental state. (*Id.* at 201:7–18.) On September 3, 2019, Dr. Berthold issued a report concluding that Mia had suffered from suicidal ideations and diagnosing her with major depressive disorder ("MDD") and posttraumatic stress disorder ("PTSD"). (ECF No. 26-1.) In her report, Dr. Berthold emphasized the importance of keeping Mia with her father and explained that "[f]urther separation from a parent would be greatly traumatizing for [Mia] to the extent that, in my professional opinion, it would likely compromise her functioning and safety and would put [Mia] at risk for becoming suicidal again." (*Id.* at 8.)

Despite these dire diagnoses, neither Petitioners nor their counsel acted on them for several weeks.  At some point in October 2019, Petitioners' immigration counsel Bridget Cambria discussed concerns that she had, based on the report with an attorney from the Department of Justice's Office of Immigration Litigation.  (Tr. 1/7/20 at 117:3-117:6.)  She then waited several more weeks for a response.  (*Id.* 117:20-119:15.)

Aside from meeting with Dr. Berthold, Mia also meet with Dr. Michael Mosko, a staff psychologist at BFRC.  Dr. Mosko is the designated attending mental health provider for detainees like Mr. H and Mia.  (Tr. 1/7/20 at 99:1-99:4.)  On July 28, 2019, Dr. Mosko performed an in-person mental health intake of Mia.  (ECF No. 27-26 at 2.)  He did not diagnose her with any mental health condition at that time.  (*Id.* at 4.)  Since then, Mia has received weekly, in-person Mental Health Wellness Checks with Dr. Mosko during her detention in BFRC.  (*Id.*; Tr. 1/7/20 at 102:13–102:17.)  The weekly well checks are usually five minutes long, but can last longer if necessary.  (Tr. 1/7/20 at 102:21–102:25.)  Dr. Mosko has met with Mia, in-person, on at least twenty-five separate occasions since she arrived at BFRC.  (*Id.* at 103:10–103:22.)  Mia's diagnosis remains unchanged, and her medical record indicates that she has no current mental health diagnosis.  (ECF No. 27-26  at 4, 7.)  In fact, based on his experiences speaking with Mia and her father, Dr. Mosko disagrees with Dr. Berthold's conclusion that Mia is suffering from major depressive disorder and PTSD.  (*Id.* at 16–17; Tr. 1/7/20 at 118:15–119:24.)

### C.    Mr. H's And Mia's Requests for Asylum, Parole, And Bond

On November 20, 2019, counsel for Petitioners submitted a request for parole with Immigration and Customs Enforcement ("ICE"), outlining the concerns raised in Dr. Berthold's report. (ECF No. 1 at ¶ 90; ECF No. 27-28.)  That parole request was the first time that Mr. H and Mia asked to be released to live with Mrs. H.  It was also the first time that anyone provided DHS

with a copy of Dr. Berthold's report.  ICE has not responded to the parole request.  (ECF No. 1 at ¶ 98.)  However, DHS has offered to release Mia to her mother whenever Mrs. H comes to take custody of her.  (Tr. 1/7/2020 at 29:17–29:22; 38:24–39:2.)

On December 5, 2019, DHS received Petitioners' motion for a custody redetermination (i.e., motion for bond).  (Tr. 61:15–16; ECF No. 27-30.)  In a decision dated January 3, 2020, the Executive Office for Immigration Review issued its decision in response to Petitioners' motion for custody redetermination, ordering that Mia be released on her own recognizance to the custody of her mother, but denying the request with respect to Mr. H for lack of jurisdiction.  (Hearing Ex. 2 at 5.)  Specifically, the Immigration Court concluded that it did not have jurisdiction over the custody determination of Mr. H because he is classified as an arriving alien.

### D.    The Instant Petition And Motion

On December 27, 2019, Petitioners filed a petition for writ of habeas corpus, as well as a motion for a temporary restraining order and preliminary injunction.  (ECF Nos. 1, 5.)  In the writ, Petitioners assert violations of their rights to procedural due process (Count I) and substantive due process (Count II), violations of the Administrative Procedures Act ("APA") (Count III) and Section 504 of the Rehabilitation Act ("Rehab Act") (Count IV), retaliation in violation of Petitioners' First Amendment rights (Count V), and seek a declaratory judgment (Count VI).  In their Motion, Petitioners ask the Court to order their immediate release from detention to reside with Mrs. H during the pendency of their asylum petition.  Alternatively, Petitioners ask the Court to order DHS to conduct a bond hearing to consider whether Petitioners are a flight risk or a threat to the community.

The Court held a hearing on January 6 and 7, 2020.  During that hearing, the Court heard, among other things, testimony from three mental health professionals who testified about Mia's

current mental state and prognosis. First, the Court heard from Dr. Berthold. In addition to the conclusions in her report dated September 3, 2019, Dr. Berthold testified that she spoke with Mr. H and Mia via Skype on January 3, 2020. (Tr. 1/6/20 at 176:23–176:24.) Notably, Petitioners made no disclosure about that interview to DHS prior to the hearing. During that interview, Dr. Berthold spoke with Mia and her father via Skype, spending one hour with Mia and then thirty-five minutes with Mr. H. (*Id.* at 177:11–177:16.) Dr. Berthold concluded that Mia's mental health had deteriorated since her initial evaluation in August 2019. (*Id.* at 177:20–178:1.) At the time of the second interview, Mia reported that she was no longer having suicidal ideations, but Dr. Berthold explained that the fact that Mia did not mention suicidal ideation is not necessarily an indicator that she is no longer at risk for committing suicide. (*Id.* at 179:2–16, 185:24–187:8.) Dr. Berthold's conclusion that Mia is suffering from major depressive disorder and PTSD did not change following her second evaluation of Mia. (*Id.* at 177:20–177:23.) Likewise, Dr. Berthold's conclusion has not changed with respect to the harm Mia would suffer if she were separated from her father. (*Id.* at 193:1–193:21.)

The Court finds Dr. Berthold's testimony about Mia's mental health diagnoses not to be credible. Among other things, the Court reaches this conclusion based on the limited contact that Dr. Berthold had with Mr. H and Mia. It also notes that, despite the dire diagnoses in Dr. Berthold's initial report, neither she nor Petitioners' counsel took immediate steps to address the harm that Mia was supposedly experiencing. Finally, in observing Dr. Berthold, the Court found her testimony on these issues not to be credible.

Second, the Court heard testimony from Dr. Charles Nelson, a professor of pediatrics and neuroscience at Harvard University and Richard David Scott Chair in pediatric developmental medicine and research at Boston Children's Hospital. Dr. Nelson specializes in brain and

behavioral development in children, with a focus on the impact of certain environmental factors, such as exposure to neglect, violence, or maltreatment, on children's brain development. Dr. Nelson never met with Mr. H, Mia, or anyone else involved in her care. Instead, he merely reviewed Dr. Berthold's and Dr. Mosko's reports and various articles in the scientific literature. Once again, Petitioners did not provide any information to DHS about Dr. Nelson's testimony or conclusions in advance of the hearing.

Based on his review of written materials, Dr. Nelson concluded that Mia "would be at an elevated short-term risk of anxiety, depression and PTSD." (Tr. 1/7/20 at 16:4–16:7.) Dr. Nelson testified that for Mia's positive development, she needed to be outside of detention and reunited with her family. Dr. Nelson also testified that some children are "sturdier than others and are better able to withstand sort of uncertainty and acrimony and things like that, and others are more fragile." (*Id.* at 32:8–32:11.) In other words, there are some "orchid children" and there are "dandelion children." (*Id.* at 32:13–32:19.) However, Dr. Nelson admitted that he does not "know about what Mia's constitution is like." (*Id.* at 32:20–32:22.)

The Court assigns little weight to Dr. Nelson's testimony. By his own admission, he did not meet with Mia and he does not know her constitution. He therefore has no basis to testify about her, specifically. While he can offer general analysis of the risks to some children of being in stressful environments or of parental separation, his lack of personal knowledge about Mia means that he cannot say with any certainty that those risks apply in this case.

Finally, the Court heard testimony from Dr. Mosko. Dr. Mosko testified that he sees Petitioners daily in the medical unit and then during weekly well-care visits. According to Dr. Mosko, he had information from those well-care visits to determine that Mia does not suffer from any particular mental health disorders. Instead, he described that Mia's behavior was consistent

with a six-year-old who is sometimes under stress but does not have a mental health condition. (Tr. 1/7/20 at 115:9–115:21.)  He also testified that he expected that staff at BRFC would report to him if Mia displayed symptoms of a mental health condition.  (*Id.* at 117:2–117:23.)

The Court finds Dr. Mosko's testimony about Mia's mental health conditions not to be credible.  In part, this is based on the fact that Dr. Mosko's interactions with Mia have been very limited.  Indeed, most of his interactions have been five minutes or less, accompanied by an interpreter.  Moreover, Dr. Mosko's conclusions based on a lack of reports from staff is not persuasive.  Finally, the Court bases this conclusion on its observation of Dr. Mosko during the hearing.

## II.    ANALYSIS

### A.    Jurisdiction

As a general rule, this Court has subject matter jurisdiction over habeas corpus petitions concerning individuals in this judicial district.  *See* 28 U.S.C. § 2241(a) ("Writs of habeas corpus may be granted by … the district courts … within their respective jurisdictions.").  DHS challenges the Court's jurisdiction here, arguing that Section 236(e) of the INA divests this Court of jurisdiction.  *See* 8 U.S.C. § 1226(e).  Section 236(e) provides that that "[n]o court may set aside any action or decision by the Attorney General **under this section** regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."  8 U.S.C. § 1226(e) (emphasis added).

Underlying this jurisdictional dispute is a question of the basis for DHS's detention of Mr. H.  Section 235 of the INA provides for mandatory detention of aliens in various circumstances. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(ii) ("If the officer determines at the time of the [asylum] interview that an alien has a credible fear of persecution …, the alien shall be detained for further

consideration of the application for asylum."); 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 8 U.S.C. § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."). Section 236 of the INA provides that on a "warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States" and that the Attorney General "may continue to detain the arrested alien." 8 U.S.C. § 1226(a) & (a)(1).

Although DHS argues that Section 236(e) bars the Court's review of this case, Section 236(e) applies only to the Attorney General's actions taken under "this section," meaning actions under Section 236. In its brief in this Court, DHS does not address the basis for Mr. H's and Mia's detention, even though it invokes Section 236(e). Petitioners, on the other hand, argue that they are detained pursuant to Section 236(a). (ECF No. 1 at 15–16.)

The Court disagrees with Petitioners and concludes that DHS has detained Mr. H and Mia under Section 235, not Section 236. On its face, Section 236(a) applies only if the Attorney General issues a warrant and arrests an alien. That did not happen here. Instead, Mr. H and Mia appear to be detained pursuant to Section 235, either because they have a pending application for asylum or because they are not clearly and beyond a doubt entitled to admission to the country and are awaiting removal procedures. The Court need not determine whether they are subject to mandatory detention under § 1225(b)(1) or (b)(2) in order to resolve the present motion.

Notably, although DHS invokes Section 236(e) here, it took a different position before the Immigration Judge. In particular, in responding to Mr. H's and Mia's request for a custody redetermination, DHS argued that Mr. H and Mia were detained pursuant to Section 235. (ECF No. 27-32 at 4.) On that basis, the Immigration Judge ruled that she lacks jurisdiction to consider Mr. H's motion for bond. (Hearing Ex. 2.) Having secured that victory based on its argument that Petitioners are detained pursuant to Section 235, DHS cannot now change its position before this Court. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). Because Section 235 governs Mr. H's and Mia's detention, Section 236(e) does not apply here.

Even if Section 236 did govern Petitioners' detention, the Court could nevertheless consider Petitioners' constitutional challenges to the INA's statutory scheme. Petitioners raise constitutional and statutory challenges to their detention. Those claims are "beyond the authority of the immigration courts." *Sewak v. I.N.S.*, 900 F.2d 667, 670 (3d Cir. 1990). Indeed, the Supreme Court has held that the Court has jurisdiction to consider whether Petitioners' parole and bond proceedings were constitutionally defective, including a challenge to "the statutory framework that permits [their] detention without bail[.]" *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018).

During the hearing, DHS argued that the facts on which Petitioners base their claim in this case are the same as the facts on which they base their parole application and their custody redetermination petition. That argument might be correct, but it is not dispositive. This Court's jurisdiction is not based on the facts at issue; it is based on the legal dispute before it. Here, that dispute is not about the Attorney General's exercise of his discretion under the INA. It is about

whether DHS's application of the INA violates the Constitution or another statute.  The Court has jurisdiction to resolve that dispute.

###    B.    Preliminary Injunction

The Court may issue a preliminary injunction pending resolution of the case.  *See* Fed. R. Civ. P. 65(a)(1).  "[A] preliminary injunction is an extraordinary and drastic remedy" that should not be granted unless the movant makes a "*clear showing*."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (original emphasis).  Thus, before the Court can issue an injunction, the moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is the party opposing a preliminary injunction, the balancing of the equities and public interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Where, as here, the movant seeks a mandatory preliminary injunction that will alter the status quo, the movant "bears a particularly heavy burden in demonstrating its necessity."  *Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018) (citation omitted).

When multiple parties seek a preliminary injunction, each party must satisfy the various injunction factors.  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 489 (3d Cir. 2000) ("[M]ultiple plaintiffs must adduce evidence from which it might be inferred that each of them is threatened with harm."); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1179 (10th Cir. 2013), *aff'd sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ("Each set of plaintiffs must show that the district court abused its discretion when it denied their request for a preliminary injunction …"); *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, No. 19-cv-4717, --- F.Supp.3d ---- , 2019 WL 5100718, at *41-43, *46-50, *53 (N.D. Cal.

Oct. 11, 2019) (analyzing preliminary injunction factors separately for three distinct groups of plaintiffs and finding that only two categories of plaintiffs had established each factor necessary to support a preliminary injunction); *Telebrands Corp. v. Newmetro Design, LLC*, No. CV 16-cv-1981, 2016 WL 8999932, at *18 (D.N.J. Nov. 10, 2016) ("Each moving Party must also demonstrate that, if the Court were to grant a preliminary injunction, the balance of hardships would weigh in its favor."); *Miller v. Skumanick*, 605 F. Supp. 2d 634, 644 (M.D. Pa. 2009), *aff'd sub nom.*, *Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010) (analyzing preliminary injunction factors separately for parent plaintiffs and their plaintiff children).

"[T]he burden of introducing evidence to support a preliminary injunction is on the moving party with respect to the first two issues; however, the same is not true of the second two issues." *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003). For instance, "if the non-moving party feels it will suffer greater harm or irreparable harm from the injunction, it has the burden to so demonstrate." *Id.* "A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties." *Adams*, 204 F.3d at 487; *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 2008) (explaining that when ruling on a motion for a preliminary injunction, the courts may consider affidavits, written evidence such as verified pleadings and deposition transcripts, and hearing testimony).

The Parties dispute whether this Court has the injunctive power to order their release under *Mapp v. Reno*. 241 F.3d 221 (2d Cir. 2001). However, for the reasons stated below, the Court need not resolve that question.

### 1.      Likelihood of success on the merits

"To establish a likelihood of success, a sufficient degree of success for a strong showing exists if there is a reasonable chance, or probability, of winning." *Pa. v. President United States*, 930 F.3d 543, 565 (3d Cir. 2019) (quotations omitted).  The likelihood of success need not be more likely than not.  *See Fulton v. City of Phila.*, 922 F.3d 140, 152 (3d Cir. 2019).  With these standards in mind, the Court examines each claim to determine whether Mr. H or Mia is likely to succeed on the merits.

### a.      Due process

The Fifth Amendment's Due Process Clause provides, "No person shall . . . be deprived of life, liberty, or property without due process of law . . . ."  U.S. Const. Amend V.  The Supreme Court has held that the Due Process Clause has two components:  substantive due process and procedural due process.  *See U.S. v. Salerno*, 481 U.S. 739, 746 (1987).  Petitioners assert both types of claims here.

### (1)      Substantive due process

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).  The Clause also provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720.  To show a violation of substantive due process, a plaintiff must first demonstrate that he has been deprived of a protected interest.  *See Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2018).  This requires a "careful description of the asserted fundamental liberty interest . . .; vague generalities . . . will not suffice." *Id.* (quoting *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003)).

Where the government infringes on a fundamental right through legislative activity, a court must determine whether the legislation at issue is narrowly tailored to serve a compelling state interest. *See Steele v. Cicchi*, 855 F.3d 494, 502 n.8 (3d Cir. 2017) (citing *Glucksberg*, 521 U.S. at 721)). However, where the government infringes through executive action, a court must determine whether the conduct shocks the conscience. *See id.* at 502. In many cases, the distinction between a legislative and an executive action will blur, rendering this distinction difficult to apply. *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008). Here, however, because the Court concludes that Petitioners have not identified a fundamental right, it need not resolve that distinction.

For a putative right to be "fundamental," it must be "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721. The Supreme Court and Third Circuit have warned against "read[ing] these phrases too broadly to expand the concept of substantive due process as 'guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Holland*, 895 F.3d at 293 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). By extending constitutional protection to an asserted right or liberty interest, a court, "to a great extent, place[s] the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720. Thus, courts must exercise the "utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of . . . the Court." *Id.* (citation omitted). A court is "most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the constitution." *Holland*, 895 F.3d at 294 (quotation omitted).

Petitioners assert that they both have a fundamental right in "family unity."  However, the substantive due process right at issue here is not really one of family unity writ large.  Rather, the Court must be mindful of the admonition to characterize the right narrowly.  Mr. H and Mia each claims a right to release with the other so that they can be together as a family.  No such right exists, however.

In any due process case, the Court must begin with an examination of the "Nation's history, legal traditions, and practices."  *Glucksberg*, 521 U.S. at 710.  The Supreme Court has long recognized that the federal government has "broad, undoubted power over the subject of immigration and the status of aliens."  *Ariz. v. United States*, 567 U.S. 387, 394 (2012).  This authority covers aliens' admission, exclusion, and removal from the United States, including the power to detain aliens pending determinations as to whether they should be removed from the country.  *See Galvan v. Press*, 347 U.S. 522, 530 (1954); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896); *Fong Yue Ting v. U.S.*, 149 U.S. 698, 705-06 (1893).  Petitioners have not pointed the Court to any contrary authority that suggests that our national history or legal traditions permit an alien parent to accompany his or her child out of detention during removal proceedings, particularly where the child is being released to another custodial parent.  In the absence of such a showing, the Court must be wary of breaking new ground with respect to a liberty interest.

Moreover, the cases on which Petitioners base their arguments do not establish an unfettered right to family unity.  For example, in *Troxel v. Granville*, the Supreme Court held that there is an "interest of parents in the care, custody, and control of their children."  530 U.S. 57, 65 (2000).  In *Stanley v. Ill.*, the Court recognized a custodial right for parents even in the absence of a marriage.  405 U.S. 645, 650-51 (1972).  In *Meyer v. Neb.*, the Court recognized a right to "bring up children."  262 U.S. 390, 399 (1923).  However, the "Due Process Clause does not condemn

every conceivable state action that affects a fundamental right in any way." *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003). Indeed, a right can be both fundamental and limited. *See Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 247 (3d Cir. 2008) (*per curiam*). In the "context of parental liberty interests, this limitation means that the Due Process Clause only protects against deliberate violations of a parent's fundamental rights—that is, where the state action at issue was specifically aimed at interfering with protected aspects of the parent-child relationship." *McCurdy*, 352 F.3d at 827-28. Thus, an enactment that "affects the parental relationship only incidentally" is not susceptible to a challenge for a violation of due process. *Id.* at 828 (quoting *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986)).

Here, Petitioners' challenge is, in effect, a challenge against an outcome that requires Mr. H's detention while permitting Mia's release. That outcome, however, is not a product of a law or rule that targets the family relationship. Instead, it is a product of the INA, which requires Mr. H's detention as an "arriving alien," and the *Flores* Settlement, which requires Mia's release to a custodial parent. These rules are intended to effect an orderly immigration system. Whether they do so is a question for Congress, not for the Court. They are not, however, targeted at the family relationship.

The Court is aware of the decisions of District Courts around the country that have held that DHS's separation of minors from their parents while in immigration custody violated substantive due process rights. *See, e.g., J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731 (D. Conn. 2018); *Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp.3d 1149 (S.D. Cal. 2018); *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 495 (D.D.C. 2018). However, those cases are distinguishable from the instant case because DHS separated those family members itself. Its action was targeted at the family relationship.

Moreover, none of those cases involved an asserted right to be released from detention.  Instead, the cases involved a right for families to be reunified, even if that reunification took place in detention.

This Court has found only one decision that has analyzed directly the right that Petitioners assert here.  In *W.S.R. v. Sessions*, the court held that the substantive due process interest in family integrity does not dictate an alien parent's release from custody in order to remain with a child. 318 F. Supp.3d 1116, 1132 (N.D. Ill. 2018).  The Court explained that an order requiring parents' release so that they could remain with their children would be tantamount to a decision that the INA's mandatory detention provisions are unconstitutional when applied to parents whose children will be released from custody.  "There is simply no case law support for recognizing that right." *Id.*  This Court agrees.  Therefore, Petitioners are not likely to prevail on their substantive due process claim.

### (2)   Procedural due process

The Fifth Amendment's Due Process Clause mandates that the government may deprive an individual of a protected interest in liberty or property only through procedures providing "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950); *see also Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  To determine what procedures are required, the Court must balance: (1) the protected interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Billups v. Penn State Milton S. Hershey Med. Ctr.*, No. 17-cv-3348, at *5 (3d Cir. Sep. 12, 2018).

18

The Court, as noted above, has not identified a protected interest in family unity in the detention context, which could mandate Petitioners' joint release from custody. Petitioners' procedural due process claims, therefore, only implicate each Petitioner's interest "in being free from physical detention," which is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). This interest applies even with respect to immigration detainees like Petitioners, who have no legal right to be present in the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (holding that detention in connection with immigration proceedings is permissible only in "narrow nonpunitive circumstances, ... where a special justification ... outweighs the individual's constitutionally protected interest in avoiding physical restraint.") (internal quotations omitted); *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). The Supreme Court, however, has ruled that Section 235 of the INA does not include an implicit limitation on the length of an alien's detention. *Jennings*, 138 S. Ct. at 841. The lower courts must therefore determine at what point a term of detention without a hearing would violate an individual's procedural due process rights.

Here, DHS provided Mr. H and Mia with a timely bond hearing in which they could challenge their detention. In fact, the Immigration Judge determined that Mia can be released to her mother at any time. (Tr. 1/7/2020 at 29:17–29:22; 38:24–39:2.)

Mr. H also has a parole request pending. He applied for parole on November 20, 2019 but has not yet received a response. That two-month delay comes nowhere close to the type of delay that might amount to a deprivation of his liberty interest. *See, e.g.*, *Fatule-Roque v. Lowe*, No. 3:17-CV-1981, 2018 WL 3584696, at *5 (M.D. Pa. July 26, 2018) (finding that a 15-month detention pursuant to § 1225(b) did not violate procedural due process). Even if the Court were to

measure time from when Mr. H arrived at BFRC in June 2019, the passage of six-months would not rise to the level of a procedural due process violation.

Two particular circumstances bear on the Court's analysis of the passage of time here. First, Mr. H delayed for several months in seeking parole, from June until November. Second, for much of that time, Petitioners were detained at BFRC pursuant to their agreement with DHS to remain there pending the resolution of their Third Circuit appeal. Given those unique circumstances, DHS could be forgiven for thinking that Petitioners did not want to be considered for release.

Finally, the Court rejects Petitioners' argument that Mr. H has not received meaningful process because the Immigration Judge concluded that she lacked jurisdiction over his motion for custody redetermination. Mr. H was given an opportunity to make an argument about jurisdiction before a neutral arbiter. Now, he has an opportunity to appeal to the BIA. *See* 8 C.F.R. § 1003.19(f). The BIA is no rubber-stamp, as its prior order reversing the Immigration Judge in Mr. H's case demonstrates. Mr. H is not entitled to more process than he is receiving.

### b.   First Amendment retaliation

To plead retaliation for the exercise of First Amendment rights, a plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017). In some respects, the second and third elements of this claim overlap because an act is not "retaliatory" if it is not linked to the conduct at issue. Here, Petitioners claim that DHS has retaliated against them for filing their first lawsuit in this court, challenging their placement in MPP.

Petitioners have no direct evidence that DHS retaliated against them.  Instead, they contend that DHS has "released all other individuals who had originally been placed in MPP and who did not exercise their First Amendment right to petition the courts." (ECF No. 5-1 at 24.)  Petitioners rely on this purportedly disparate treatment as evidence of DHS's retaliatory action.

As an initial matter, the pool of families at issue—approximately four—is so small that the Court is reluctant to draw any conclusions based merely on the differences among them.  Moreover, the facts established at the hearing show that Mr. H and Mia were not similarly-situated to the other families that DHS has released from BFRC.  One family was removed to its country of origin; one family was refused entry into Mexico by the Mexican authorities (meaning it is no longer eligible for MPP); and one family was paroled following a positive non-refoulement review. (Tr. 1/7/2020 at 71:6–71:17.)  Mr. H's and Mia's circumstances are thus different from each of those families.  They have not been removed to Guatemala; Mexico has not refused their entry so they are still eligible for MPP; and they have not received a positive non-refoulement review. These differences mean that the Court cannot infer retaliatory motive from the disparate treatment. Instead, the differences among the families led DHS to make different judgments about them, as it was entitled to do.  Petitioners therefore have not shown that they are likely to succeed on their retaliation claim.

### c.      APA

A district court has jurisdiction to review an agency's determination under the APA only if the agency action (1) is final, (2) adversely affects the party seeking review of the decision, and (3) is non-discretionary.  *See Pinho v. Gonzales*, 432 F.3d 193, 200 (3d Cir. 2005).  An agency action is considered "final" when two conditions are met.  First, the agency action "mark[s] the consummation of the agency's decision-making process" and is not "merely tentative or

interlocutory in nature." *Id.*  Second, the agency action is one from which "rights or obligations have been determined" or from which "legal consequences will flow." *Id.* (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  For a decision to be final, a plaintiff must show that he has exhausted his administrative remedies, but "only when expressly required [to do so] by statute" and only when the statute sets forth "steps that [he] can take to have an action reviewed within the agency." *Jie Fang v. Dir. United States Immigration & Customs Enf't*, 935 F.3d 172, 181 (3d Cir. 2019).  Moreover, the district court is empowered to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]"  5 U.S.C. § 706(2)(A), or if the action failed to meet statutory, procedural or constitutional requirements.  *Rite Aid of Pennsylvania, Inc. v. Houstoun*, 171 F.3d 842, 853 (3d Cir. 1999).

Mr. H is unable to assert a violation of the APA for refusing to grant him bond or parole because neither agency action is final.  Mr. H requested that ICE grant parole on November 20, 2019, but the agency has yet to make a determination.  Given the short amount of time that has lapsed since Mr. H's parole request, this Court is unwilling to find that the agency's delay amounts to a denial of parole.  At the same time, on December 5, 2019, DHS received a bond request from Mr. H, and a bond hearing concluded before the immigration court on December 24, 2019.  On January 3, 2020, the immigration court issued its decision, finding that it does not have jurisdiction over Mr. H's custody redetermination.  However, the immigration court's decision is not a final determination because Mr. H retains the "right to appeal the Court's decision" to the BIA. (Hearing Ex. 2 at 5); 8 CFR § 1003.19(f).  Accordingly, neither Mr. H's parole nor his bond request implicates a final agency action that this Court may review.  Likewise, because Mr. H's parole and

bond proceedings are still ongoing, he has failed to exhaust administrative remedies, as required, before seeking relief here.  *See Okonkwo v. I.N.S.*, 69 F. App'x 57 (3d Cir. 2003).

To the extent Mia asserts a violation of the APA with respect to her own bond request, her claim is moot; the immigration court granted her requested relief on January 3, 2020, and she is free to join her mother in New Jersey pending the resolution of her asylum proceedings.  (Hearing Ex. 2.)  However, to the extent Mia's APA claim stems from a purportedly "final [agency] decision refusing to release Mia and Mr. H together," her claim is premature.  (ECF No. 5-1 at 21.)  As stated above, there has been no final agency action that this Court may review with respect to Mr. H's bond request because he can appeal the immigration court's decision to the BIA.

Finally, Mr. H and Mia assert that the alleged final agency action is arbitrary and capricious because the continued refusal to release Mia and Mr. H together is contrary to their substantive and procedural due process rights and First Amendment right to petition the government for redress of grievance.  Because this Court finds that Mr. H and Mia are unlikely to succeed on the merits of their constitutional claims, the agency's actions cannot be found to be arbitrary and capricious on that basis.  Thus, neither Mr. H nor Mia is likely to succeed on their APA claims for this reason as well.

### d.    Rehab Act

Section 504 of the Rehab Act requires federally funded programs to offer persons with disabilities "meaningful access" to programs they administer by providing reasonable accommodations in the program.  29 U.S.C. § 794(a).  To state a claim under the Rehab Act, a plaintiff must demonstrate:  (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; (3) such exclusion, denial

of benefits, or discrimination was by reason of his disability; and (4) the defendant receives federal assistance. *See Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015); *see also Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). A disability is a "physical or mental impairment that substantially limits one or more major life activities . . . ." 28 U.S.C. § 705(20)(B).

Mr. H cannot prevail on a claim under the Rehab Act. He has not alleged that he has any disability. Dr. Berthold stated that she did not evaluate Mr. H, and neither she nor Dr. Nelson drew any conclusions about his mental state. As a result, Mr. H has no basis to suggest he is disabled, and he therefore cannot prevail on a claim under the Rehab Act. Notably, Petitioners do not argue otherwise. Mr. H also does not suggest that he has been excluded from participation in any program, let alone that the exclusion was a result of a disability. Indeed, the record demonstrates that Mr. H has participated in all of his immigration proceedings without restraint.

Mia also has not shown that she is likely to prevail on her claim under the Rehab Act. First, Petitioners have not shown that Mia is a qualified individual with a disability. Petitioners point to Dr. Berthold's report and testimony, but the Court has found that testimony not to be credible. No other evidence in the record establishes that Mia suffers from a disability. Even if she did suffer from such a disability, however, the evidence in the record does not establish that Mia has been excluded from participation in any public entity's services, programs, or activities. Petitioners argue that Mia's disabilities might prevent her from participating in her asylum proceeding. However, as a seven-year-old child, Mia's direct participation in any proceeding will be limited. Moreover, there is no evidence that Mia cannot participate in such a proceeding. Indeed, Dr. Berthold, a virtual stranger, was able to have two 45-minute conversations with Mia. The Court therefore cannot conclude that Mia will be unable to provide the limited information

24

that will be requested directly from her (as opposed to others on her behalf) in an asylum proceeding.

### 2.  Irreparable injury

Although Mr. H and Mia are unlikely to prevail on the merits, the Court does consider the other injunction factors.  With respect to the second factor necessary to support the entry of a preliminary injunction, "'[i]rreparable harm' means harm 'such that legal remedies are rendered inadequate.'"  *Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 342 (3d Cir. 2019) (quotation omitted); *see also Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("[T]he injury created by a failure to issue the requested injunction must 'be of a peculiar nature, so that compensation in money cannot atone for it….'").  Furthermore, because the movant must make a "clear showing" that it is entitled to a preliminary injunction, the mere possibility of irreparable harm is insufficient.  *Winter*, 555 U.S. at 22 (citation omitted).  "A party's delay in seeking a preliminary injunction could 'belie[ ] its claim of irreparable injury.'"  *URL Pharma, Inc. v. Reckitt Benckiser Inc.*, No. CV 15-cv-505, 2016 WL 1592695, at *11 (E.D. Pa. Apr. 20, 2016) (quotation omitted).  This is because a "[d]elay in seeking enforcement of those rights ... tends to indicate at least a reduced need for such drastic, speedy action."  *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 118 (3d Cir. 2013) (quotation omitted).

Here, both Mr. H and Mia argue that their detention results in their separation from the rest of their family and that Mia's release to Mrs. H would harm her by separating her from her father.  Courts have recognized that separation from family members constitutes an irreparable injury.  *See, e.g., Ragbir v. U.S.*, No. 17-cv-1256, 2018 WL 1446407, at *18 (D.N.J. March 23, 2018); *U.S. v. Diana*, Crim No. 83-cv-301, 1988 WL 17011, at *2 (E.D. Pa. Feb. 25, 1988). Moreover, that injury is clear here.  Mr. H has a newborn son, and he does not get to spend time with his son.

No amount of money can compensate Mr. H for that lost time.  Similarly, Mia has lost time with her mother and her newborn brother.  No money can repay that.

Much of the testimony at the hearing centered on Mia's well-being.  To the extent that testimony was intended to establish an irreparable injury, it was both unnecessary and, as discussed above, unconvincing.  Separation itself establishes an injury for both Mr. H and Mia.  Additional evidence on this point, even if it had been credible, was therefore unnecessary.

### 3.        Balance of equities/public interest

The balance of equities and public interest here tip very slightly in DHS's favor, in the Court's view, for two reasons.  First, there is a risk that Mr. and Mrs. H might abscond if the Court were to parole Mr. H.  DHS argues that Mr. H and Mia would be flight risks merely because they would be arriving aliens subject to removal.  The Court disagrees with that argument.  Indeed, as the Court noted at the hearing, DHS has released countless other aliens who have been paroled pending their removal proceedings.  (Tr. 1/6/2020 at 84:22–84:25.)

However, the Court has concerns that this particular family might flee, given the concerted effort they have made to come to this country.  Indeed, Mr. H and Mrs. H apparently formulated a plan to come here at the same time.  Mr. H's arrival here illegally with Mia at the time that Mrs. H was here on a temporary visa suggests to the Court that the family intended all along that Mrs. H would overstay her visa.  Then, Mr. H concealed his relationship with Mrs. H until shortly after Mrs. H gave birth here, making their son a U.S. citizen.  All of this indicates that the family is committed to staying here, regardless of the legality of doing so.  The Court is therefore concerned that the family might abscond.  The Court recognizes that these are only suspicions, inferred from circumstantial evidence.  Yet the Court often must evaluate such circumstantial evidence in

considering whether any particular person poses a risk of flight.  Because these are only suspicions, though, this factor tips only very slightly in DHS's favor as the Court considers these factors.

Second, the Court is mindful of DHS's concern that ordering Mr. H's release could operate as an end-run around the *Flores* agreement under the particular circumstances.  In this case, the Immigration Judge determined that because of the *Flores* agreement, Mia was entitled to a bond redetermination despite the fact that she is classified as an arriving alien subject to mandatory detention.  (Hearing Ex. 2.)  Thus, Mia is entitled to release because *Flores* applies to her.  In this instance, ordering the simultaneous release of Mr. H would have the practical effect of enforcing the *Flores* agreement as applied to him, something that this Court has already determined it does not have the power to do.  *See Hernandez Culajay v. McAleenan*, 396 F. Supp. 3d 477 (E.D. Pa. 2019).  Given these broader implications, the Court does not believe that the public interest would be served by ordering Mr. H's release.

4.  **Unclean hands**

The equitable defense of unclean hands requires that "[h]e who comes into equity must come with clean hands."  *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933). Unclean hands can apply in cases charging constitutional violations.  *See Gomez v. U.S. Dist. Ct. for Northern Dist. of Cal.*, 112 S.Ct. 1652, 1653 (1992) (*per curium*) (in Eighth Amendment claim, equity must take into account defendant's "obvious attempt at manipulation").  The doctrine "applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation."  *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001).  The conduct at issue to trigger an unclean hands defense must "transgress equitable standards of conduct."  *Scherer Design Grp. v. Ahead Engineering LLC*, 764 F. App'x 147, 150 n.6 (3d Cir.  2019) (quoting *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592,

598 (3d Cir. 1972)).  The misconduct "need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character," however.  *Id.* (same). The Court has wide discretion in refusing equitable relief to a litigant with unclean hands.  *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945).  "The unclean hands doctrine 'is not an automatic or absolute bar to relief; [rather,] it is only one of the factors the court must consider …."  *Scherer Design Grp.*, 764 F. App'x at 150 (quotation omitted).

The evidence in this case demonstrates that Mr. H has come to this Court with unclean hands.  First, it appears that Mr. H and his wife made a decision to have the family come to the country, regardless of whether it was legal for them to do so.  Indeed, it is notable that Mr. H and Mia arrived at the southern border around the same time that Mr. H's wife arrived in the country. That temporal proximity strongly suggests that they came here as part of a common plan to come to this country.  *Cf. LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (temporal proximity of events can demonstrate causal link); *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (same).

Second, as part of the decision to come here, Mr. H and his wife made a conscious decision to separate from each other, even though they knew that Mrs. H was pregnant.  (ECF No. 26-2 at ¶ 19.)  They also chose to separate Mia from her mother.  Then, Mr. H doubled down on that strategy.  From the time Mr. H arrived here, he could have told ICE and/or the immigration judge that his wife was here, and Mia could have been placed there.  Yet he kept that fact to himself.  He did so before they were sent to Mexico, he did so after they returned, and he did so for much of the time that they were at the BFRC.  In fact, Mr. H kept his wife's identity and location from DHS until he sought parole on November 20, 2019.  That is, he waited until after his wife had had their baby here.  Again, the temporal proximity of the baby's birth to Mr. H's parole request suggests

28

to the Court that his actions were intentional.  He wanted to avoid putting his wife on ICE's radar until after she had a newborn son who was a U.S. citizen.

Moreover, Mr. H's conduct is directly relevant to his current injunction request, in which he claims a pressing need to keep his family together.  His conduct has also harmed DHS by forcing it to defend the extended detention of Mr. H and Mia when it could have addressed Mia's detention, if not the entire family's situation, much earlier had Mr. H only spoken up.  The Court concludes that Mr. H's unclean hands bar his request for injunctive relief.

Of course, Mia does not have unclean hands.  She did not make any of the decisions that led her, and her family, to this point.  Rather, she is an unfortunate victim of circumstance. However, for the reasons set forth above, Petitioners have not shown that Mia is likely to prevail on the merits of her claims.  She therefore is not entitled to a preliminary injunction.

## III.    CONCLUSION

The Court sympathizes with Mr. H and Mia.  They find themselves in a difficult position. It is, however, a position largely of Mr. H's making.  Mia remains free to leave with Mrs. H at any time.  However, Petitioners have not demonstrated that either of them has a right to demand that DHS release Mr. H along with Mia.  Therefore, the Court will deny the Motion for a preliminary injunction.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

Dated:  January 22, 2020